IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
5:04CV193-MU-02

LAMONT CLAXTON UNDERWOOD,       )
    Petitioner,                 )
                                )
      v.                      )
                                )               O R D E R
SIDNEY D. HARKLEROAD,           )
  Administrator of Marion       )
  Correctional Institution,     )
    Respondent.                 )
_____)

**THIS MATTER** comes before the Court on Petitioner's Petition for a Writ of Habeas Corpus under 28 U.S.C. §2254, filed November 30, 2004; on Respondent's combined "Motion for Summary Judgment And Answer . . . ," filed February 7, 2005 (document # 12); Respondent's Motion to Strike Petitioner's New Affidavits (or Evidence) and Alternative Motion to Authorize Respondent to Submit New Affidavits or Evidence from Trial Counsel, filed May 24, 2005 (document # 14); Respondent's Motion to Lodge Trial Counsel's Affidavit Responding to Ineffective Assistance of Counsel Claims, filed September 14, 2005 (document # 20); Petitioner's Motion for Extension of Time to File Reply Response to Motion to Lodge Trial Counsel's Affidavit, filed September 19, 2005 (document # 21); Petitioner's second Motion for Extension of Time to File Reply Response, filed October 20, 2005 (document # 22); and on Petitioner's Motion to Amend Response to Motion to Lodge Trial Counsel's Affidavit, filed November 28, 2005 (document # 26).

# I. FACTUAL AND PROCEDURAL BACKGROUND

On January 30, 1996, a Watauga County grand jury indicted Petitioner for the first-degree kidnapping and murder of Viktor Gunnarsson. After pleading "not guilty," Petitioner subsequently proceeded to a jury trial during which he was represented by attorneys Bruce Kaplan and Chester Whittle.

The State's theory, as partially revealed during its opening statement, was that Petitioner, a former veteran law enforcement officer, was a jealous, jilted lover who killed Mr. Gunnarsson because he saw him as a romantic rival. More specifically, the State theorized that Petitioner had refused to accept his former fiancé, Kay Weden's, decision to break off of their engagement; that he stalked, spied on and harassed Weden and her son; that Mr. Gunnarsson had begun to date Weden shortly before his murder; and that upon learning that Weden was dating Mr. Gunnarsson, Petitioner kidnapped Mr. Gunnarsson from his home in Rowan Couny, took him to a secluded area along the Blue Ridge Parkway in Watauga County where he shot and killed him. In addition, the State theorized that approximately three days later, Petitioner also shot and killed Weden's mother (Catherine Miller) because she was not supportive of Weden's engagement to Petitioner.

However, during their investigations of the two murders, law enforcement officers conducted numerous interviews, some of which revealed potential alternative suspects for both murders. In-

deed, both Rowan County authorities and agents from the State
Bureau of Investigations ("SBI," hereafter) interviewed Terry
Osborne, a Rowan County resident who subsequently was elected as
the County Clerk of Court. During his interview with the SBI,
Osborne related that he had observed an individual leaving the
area of Catherine Miller's home around the time that she was
believed to have been killed. Osborne also said that he was
positive that Petitioner was not the man he saw, as the man he
saw was "baby faced" in his "early 20s," and had a different
build than Petitioner's. Osborne also indicated that the man he
saw had a "brisk and 'springy'" walk like that of a young person.
In fact, Osborne stated that the man he saw "resembled the crazy
foreign exchange student" whom Ms. Miller's daughter (Weden) was
boarding at that time.

Osborne further told SBI agents that he had given that in-
formation to Rowan County authorities on the day after Miller's
murder; that he had seen the man from the crime scene a week
later; that he had given the man's license plate number to Rowan
County investigators; but that those officers were reluctant to
take the information. Osborne stated that the man's car was the
same make as Petitioner's, but did not match Petitioner's license
plate. Osborne told the SBI agents that one of the officers who
interviewed him was upset about his having identified someone
other than Petitioner, and stated "it didn't matter because he

3

was going to put the murder on Petitioner."[1]

In their opening statement, the defense conceded that Peti-

---

[1]In addition, in June 1995, an S.B.I. agent interviewed Robbie Smith, a Rowan County resident. Smith told authorities that an acquaintance of his, Brandon Shelton, had, on at least four occasions, confessed to killing Mr. Gunnarsson. Shelton reportedly told Smith that he and his friend (Michael Blackwelder) killed Mr. Gunnarsson because Shelton caught him and his wife (Heather) at the Shelton home following a sexual encounter, and Heather had admitted her affair with Mr. Gunnarsson. Shelton reportedly gave Smith details about the offense that were not publicly known.

On April 11, 1995, an SBI agent interviewed Heather Shelton. Heather told authorities that her husband (Shelton) had caught her and Mr. Gunnarsson after they had had sex and threatened to kill them; Shelton had confessed to her that he and Blackwelder killed Mr. Gunnarsson, which confession Heather believed; that Shelton kept newspaper articles about Mr. Gunnarsson's murder; and that after the murder, Shelton told her that she would never have sex with Mr. Gunnarsson again.

On July 25, 1995, an SBI agent interviewed Brandon Shelton. According to the notes, Shelton told the agent: (1) that he was jealous over his wife; (2) he had caught his wife with Mr. Gunnarsson; (3) Heather admitted the affair; (4) he had threatened to kill Mr. Gunnarsson over the affair; (5) he planned to "get" Gunnarsson at his first opportunity; (6) he befriended Mr. Gunnarsson in order to give him a false sense of security; (7) his friend, Michael Blackwelder, had a key to Mr. Gunnarsson's apartment; (8) he last saw Mr. Gunnarsson on the date of his murder; (9) he had borrowed a .22 caliber pistol and a .38 caliber pistol (the calibers used to kill Mr. Gunnarsson and Miller, respectively) from a neighbor; (10) he kept newspaper clippings on Mr. Gunnarsson's case; (11) he and Blackwelder had planned to go to Mr. Gunnarsson's home on the night of his murder to "get" Gunnarsson; (12) he had confessed to Smith (and others) that he killed Mr. Gunnarsson, and had given Smith details about the crime; and (13) he was very familiar with the Blue Ridge Parkway area where Mr. Gunnarsson's body was found. Notes from the interview further reflect that when asked whether he had killed the decedent, Shelton merely declined to answer the question; and that when he was asked if he had a briefcase containing the confession and the gun used to kill Mr. Gunnarsson, Shelton stated that he wanted to talk with an attorney before answering the question.

Also, on March 13, 1997, an interview was conducted with Shannon Tedders, a homeowner who lived adjacent to the Watauga County lot on which Mr. Gunnarsson's body was found. Tedders told authorities that in the hours after Mr. Gunnarsson was believed to have been murdered and dumped, she got a good look at a man who was coming from the area where the body later was found. Tedders said she had never seen anyone come from that area before that date. Tedders described the man and police used the description to compel Petitioner to appear in a line-up. However, Tedders' description did not match Petitioner and she did not pick him out of the line-up. Tedders told her interviewer that one of the investigators expressed disappointment that she had not identified Petitioner. Tedders reported that when she saw Petitioner's picture in the newspaper, she was sure that he was not the man she had seen on the morning in question.

4

tioner had been in a "stormy relationship" with Weden, he was
hurt about their break-up, and he wanted to rekindle their rela-
tionship. Nevertheless, the defense told the jury, among other
things, that they "ha[d] a confession by someone else who said he
killed Mr. [Gunnarsson]"; that they "ha[d] someone who saw some-
one outside of Ms. Miller's house at the time of her murder, the
Clerk of Court down there in Rowan County, and a composite sketch
was made. It was not Mr. Underwood." Counsel also said that
"there is an eyewitness who supposedly saw someone after Mr. Gun-
narsson's body was found out there in Deep Gap. Mr. LC Underwood
was put in a line-up and the individual sat there and looked at
him with six other guys: No, he isn't the person I saw." (Trial
Tr. at 1117).

Once the trial commenced, as recounted by the North Carolina
Court of Appeals' published opinion, the State presented several
witnesses whose testimony tended to establish a circumstantial
case for murder against Petitioner. More particularly, the
State's evidence showed that Petitioner and Weden began a rela-
tionship, over the course of which Weden received three anony-
mous, threatening letters. North Carolina v. Underwood, 134
N.C.App. 533, 535 (1999). One such letter stated that a .22
caliber bullet had been fired into her home. Id. A deputy
sheriff later found a .22 caliber bullet lodged in the exterior
of Weden's home near her son's bedroom. Id. In either late

November or early December 1993, Weden ended the relationship, but Petitioner was not pleased with their break-up. Id.

The State's evidence further showed that on the night of December 3, 1993, Gunnarsson and Weden had dinner together. Id. at 534-35. After dinner, Gunnarsson drove his car back to Weden's home. Id. At 535. That night, Petitioner and a female acquaintance drove past Weden's home and saw Gunnarsson's car. Id. Petitioner contacted a friend in law enforcement who ran a license plate check and determined that the car was registered to Gunnarsson, but it showed an address which was different from the one at which Gunnarsson lived. Id. Gunnarsson returned to his home some time after 11:30 p.m. on December 3. Id. Either later that night or early the next morning, Gunnarsson was bound and abducted from his apartment, transported to the Blue Ridge Parkway, shot twice in the head with a .22 caliber firearm and his body was left there. Id. at 534.

On December 6, 1993, Petitioner visited a restaurant where Weden and her mother, Ms. Miller, were dining. Id. at 536. Petitioner told Weden that her mother had ruined their relation- ship and that he wished something would happen to Miller so that Weden would know how he felt. Id. On December 9, 1993, Ms. Miller was found dead in her home from two .38 caliber firearm gun shots to her head. Id. The bullets taken from Ms. Miller's body were said to be consistent with bullets shot from a Colt .38

Detective's Special.  Id.

On January 7, 1994, Mr. Gunnarsson's body was found by a North Carolina Department of Transportation employee.  Id. at 534.  Medical experts determined that Mr. Gunnarsson had been dead for weeks; that his last meal consisted of the food which he had eaten with Weden on December 3, 1993; that he died within a few hours of eating that meal; and that hair samples from Mr. Gunnarsson were identical with several hairs which were found on a mat inside Petitioner's trunk.  Id. at 534, 536.

The State also presented evidence that during the course of Petitioner's relationship with Weden, he had worked as a Police Officer at Salisbury High School.  Id. at 535.  Evidence showed that a typewriter at the school had been used to address one of the threatening letters which Weden had received.  Id.  Evidence further showed that Petitioner owned a .22 caliber pistol and a .22 caliber rifle; that he previously had been issued a .38 caliber revolver in connection with his former employment as a deputy sheriff in Lincoln County; and that despite Petitioner's separation from that position, the .38 caliber gun could not be located.  Id.  Last, the State's evidence showed that at some point in late December 1993 or early January 1994, Petitioner had his car thoroughly cleaned, including having his trunk carpet shampooed.  Id. at 535-36.  Nevertheless, scratches and a mark resembling a foot print were found in the trunk.  Id.

The defense's cross-examination of the State's witnesses showed, among other matters, that the weapons used to murder Gunnarsson and Miller were not recovered. (Trial Tr. at 1575). During the initial stages of the investigations, Petitioner's car was searched and the trunk mats were thoroughly examined, but no blood or hair was found until some 20 months later when, on the sixth attempt, 17 head hairs were found on a mat. (Trial Tr. at 1212-14 and 1571-78). Although Mr. Gunnarsson, who was described as having a great deal of body hair, was believed to have been transported in the nude, the head hairs which were found were located within a one foot diameter on the mat. (Trial Tr. at 1170 and 1214). The pathologist who examined Mr. Gunnarsson's body opined that the two gunshots were fired at Gunnarsson from two different directions. (Trial Tr. at 1177). Last, cross-examination established that the bullets which killed Ms. Miller could have been fired from a .357 caliber gun. (Trial Tr. at 620).

After the State rested its case, the defense declined to put on any evidence. During their initial closing argument, defense counsel made no mention of their decision to rest, including their decision not to present the testimony to which they had alluded during opening statements. (Trial Tr. at 9-17). Indeed, the defense's first closing, quite interestingly, included a monologue on the origins and development of our Nation's jury

8

system, a very general explanation of the standard for convic-
tion, and a request that the jury avoid being prejudiced or bias-
ed against Petitioner. (Trial Tr. at 10-17). There was no
discussion of the quality or quantity of the State's evidentiary
presentation.

However, during the State's closing argument, one of the
prosecutors, albeit over defense counsels' objections, told the
jury:

> Ladies and gentlemen, some three weeks ago, I
> guess, approximately, Mr. Whittle stood in
> front of you making an opening statement. He
> told you at that time that what [Petitioner]
> intended to show through his evidence was
> that there was an eyewitness who saw someone
> coming from the woods in Deep Gap at a time
> approximating the murder of Viktor Gunnars-
> on. He told you at that time that [Peti-
> tioner] would show you a confession by
> someone else to this terrible crime.
>
> . . .
>
> He told you at that time that he would show
> you that a witness, the Clerk of Court, I
> believe, saw someone around Catherine
> Miller's home at the time she was murdered.
> He told you that they would show you through
> witnesses that Jason Weden [Kay Weden's son]
> was the problem between Kay Weden and this
> [Petitioner]. Where, ladies and gentlemen,
> are those witnesses.
>
> . . .
>
> Where are those people who will sit here in
> this chair in front of this microphone and
> tell you those things that [Petitioner's]
> attorney said he would tell you?
>
> In fact, ladies and gentlemen, you heard

9

> nothing about any of those things. In fact,
> the State's case remains uncontradicted. In
> truth, Viktor Gunnarsson and Catherine Miller
> died at the hands of [Petitioner], overcome
> by a raging jealously, an obsessive jealousy
> that led him to murder.
>
> . . .

(Trial Tr. at 17-19).

In fact, it was not until after the State noted the defense's omissions and had given its own extensive discussion of the evidence when, during their second closing argument, one of Petitioner's attorneys discussed the evidence and attempted to address their obvious omission by telling the jury:

> Then they say, well, they didn't -- you
> didn't bring us any witnesses about a line-
> up. How many -- do we have to do that when
> every officer here said, Yeah, I was in a
> line-up; no -- I was there for the line-up;
> no LC Underwood was not identified. And it
> was the person that lives closest to the
> scene where this happened who saw somebody.
> How many - I mean, do we have to bring them
> in here and say, yeah, I said that.
>
> Was there a composite: Yes. Yeah, there was
> a composite they say, from the three witness-
> es you heard say -- do we have to bring you
> in a composite when they all say, Well, no,
> the composite was not LC Underwood? How
> necessary is that? Supposed to take up a
> bunch more time when we had to bring it out
> of them.

(Trial Tr. at 59). Thereafter, Petitioner's other attorney attempted to address the matter by telling the jury:

> . . . I asked you if you understood that the
> defense need not present any evidence in the
> case, and you all said you understood that

10

and said yes. In this case, we did not
because we did not feel it was necessary to
present any evidence, because the State has
not proven its case beyond a reasonable
doubt."

. . . .

Mr Wilson stands up and says we didn't bring
a witness. Well, we didn't need to bring a
witness. You heard it consistently that the
person who lived most closely to where Mr.
Gunnarsson's body was found was taken by an
agent of the state, by Paula Townsend, driven
to Salisbury for a line-up that included Mr.
Underwood where he was required to stand in
the line-up and this witness couldn't
identity him as that person.

. . .

The State wants you to ignore and believe
there did not exist a composite picture made
concerning a person that was seen in the
vicinity of Catherine Miller's home. When
Don Gale was first asked about it, he said,
well, that was just a suspect. Terry Agner
later on says it was a suspect, too.

But what did Don Gale say when he was ques-
tioned on cross-examination, when he was
questioned about a sworn affidavit that he
made and he said, Yeah, I must have said
that. When he said - his testimony was, a
composite has been created of a person seen
outside of the home of the victim just prior
to her death. It is the opinion of several
investigators, not just Don Gale, that Mr.
Underwood resembles the composite of the
suspect. Is that equivocal? Can you have
any question that they are talking about the
suspect seen just prior to her death? Can
you have any question?

. . .

The person in the neighborhood, person's
closest residence to the place where Viktor
Gunnarsson was found, saw someone, saw

> someone she could identify. She saw someone
> she gave information to the detectives about,
> saw someone sufficient that the State felt it
> was important to have a line-up. Who was
> that person? We don't know. Was that person
> most likely the one that did in fact carry
> him to where he was found? The answer is
> yes. Is that person Mr. Underwood? The
> answer is absolutely no.

(Trial Tr. at 90, 93-94, 117).

Following their deliberations, the jury convicted Petitioner of the kidnaping and murder. Petitioner was sentenced to a term of life imprisonment plus forty years for those offenses.

Petitioner directly appealed his case to the North Carolina Court of Appeals arguing that the trial court erred: (1) in admitting evidence of the Miller murder in violation of State evidentiary rules; (2) in denying his request for an instruction on the limited use of the Miller evidence; (3) in admitting certain expert testimony; and (4) in failing to dismiss all of the charges due to the insufficiency of the evidence. <u>North Carolina v. Claxton</u>, 134 N.C. App. 533, 536-44 (1999). However, the State Court of Appeals rejected all of Petitioner's claims, finding instead that the evidence concerning the Miller murder properly was admitted pursuant to Rule 404(b) of the N.C. Rules of Evidence and its instruction on that issue was proper; that the DNA evidence properly was admitted under Rule 702 of the N.C. Rules of Evidence through the State's experts; and that the evidence was sufficient to withstand Petitioner's motion to

dismiss. Id. Thereafter, the State Supreme Court denied Petitioner's request for certiorari review. North Carolina v. Underwood, 352 N.C. 669 (2000).

On October 4, 2001, Petitioner filed a Motion for Appropriate Relief in the Superior Court of Watauga County arguing that he was subjected to ineffective assistance of counsel by virtue of numerous shortcomings by counsel, including their failure to "call key witnesses regarding prior statements they had given and facts that were known about them that would have aided in Petitioner's defense"; that the evidence was insufficient to sustain his convictions; that he was denied his constitutional rights to a fair and impartial trial; that the trial Court erred in allowing the State to introduce certain evidence concerning the Miller murder; that the prosecutor engaged in misconduct by improperly shifting the burden of proof by implying his guilt during closing arguments; and that the indictment was insufficient to sustain his first-degree murder conviction. However, the MAR Court entered an "Order of Summary Dismissal" upon a conclusion that there were "no probable grounds for relief." On August 30, 2004, Petitioner's certiorari petition was denied by the State Court of Appeals.

Consequently, Petitioner came to this Court on his Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254. The Petition first argues that Petitioner was subjected to ineffective assis-

tance of counsel by virtue of his attorneys having promised in opening statement, but failing to present, certain exculpatory evidence -- that another individual had confessed to the Gunnarsson murder and that two eye witnesses saw someone other than Petitioner leaving the scenes of both the Gunnarsson and Miller murders. Petition also argues that trial counsel were ineffective for having rested without offering the foregoing exculpatory evidence and for failing to present compelling evidence to challenge and impeach the prosecutor's theory that Petitioner killed Catherine Miller; and that the murder indictment was constitutionally deficient because it failed to allege all of the necessary elements of first degree murder.

Respondent has filed a combined Motion for Summary Judgment and Answer to Petition arguing that there are no genuine issues of material fact to be resolved and Respondent is entitled to a judgment as a matter of law. More particularly, Respondent argues that Petitioner's trial attorneys' decision not to present the subject "exculpatory" evidence was a reasonable strategy based upon counsels' reported belief that the State had failed to prove its case, and their apparent recognition that the subject evidence was weak in comparison to the "strong, albeit circumstantial, evidence" presented by the State. Indeed, Respondent contends that because law enforcement never secured an express confession directly from Shelton, trial counsel had no obligation

to go forward with such uncertain and weak evidence of an alternative killer.

Respondent further notes that Petitioner failed to present the statements of three of the would-be witnesses -- Robbie Smith, Heather Shelton and Shannon Tedders -- to the MAR court; therefore, evidence concerning their statements may not now be considered by this Court. Similarly, Respondent asserts that Petitioner failed to establish, by affidavits or otherwise, that those witnesses actually would have testified consistently with their earlier statements had they been called as witnesses, thereby suggesting that trial counsel were justified in their decision not to call these witnesses.

Respondent also argues that even if Smith and Heather had been called as witnesses, neither of them would have been able to testify about Shelton's confessions due to the rules prohibiting hearsay and the compulsion of testimony by one spouse against the other. With regard to Tedder's statement, Respondent contends that trial counsel did establish, by cross-examination, that she saw someone else in the area of Mr. Gunnarsson's body and she did not identify Petitioner in a line-up.

Concerning the Miller murder, Respondent argues that very little would have been gained from presenting the testimony of Terry Osborne which, in substance, amounted to "someone saying, I sa[w] some other guy near there that day." Id. at 13. There-

fore, Respondent contends that Petitioner cannot establish a reasonable probability that a different result would have been secured had trial counsel presented the subject evidence.

As to Petitioner's claim that the murder indictment was constitutionally deficient, Respondent argues that such "short-form" indictment claim already has been put to rest by the case of Allen v. Lee, 366 F.3d 319, 323-24 (4th Cir.) (en banc) (holding that North Carolina's "short-form" first-degree murder indictment is constitutionally adequate and does not violate the rules from Jones v. United States, 526 U.S. 227 (1999) or its progeny). Therefore, Respondent urges this Court to reject this claim and to deny Petitioner's Petition in its entirety. Notwithstanding Respondent's arguments, however, the Court has concluded that the State court's determination that trial counsel were not ineffective for promising, but failing to deliver, evidence of another killer was unreasonable. Therefore, Petitioner is entitled to relief on this claim.

## II. **ANALYSIS**

### 1. **Standard of review for habeas petitions**.

Generally speaking, the standard of review to be applied by the Court to habeas cases is "quite deferential to the rulings of the state court." Burch v. Corcoran, 273 F.3d 577, 583 (4th Cir. 2001). Indeed, as the Burch Court noted:

> [p]ursuant to the standards promulgated in 28
> U.S.C. §2254, a federal court may not grant a

16

writ of habeas corpus with respect to a claim
adjudicated on the merits in state court
proceedings unless the state court's adjudi-
cation: (1) "resulted in a decision that was
contrary to, or involved an unreasonable
application of, clearly established Federal
law, as determined by the Supreme Court of
the United States" . . . ; or (2) "resulted
in a decision that was based on an
unreasonable determination of the facts in
light of the evidence presented in the State
court proceeding. . . ."

Id. (internal citations omitted).

The Supreme Court has explained that a State court adjudi-
cation is "contrary" to clearly established federal law, only if
"the state court arrives at a conclusion opposite to that reached
by [the Supreme] Court on a question of law or if the state court
decides a case differently than [the Supreme] Court has on a set
of materially indistinguishable facts." Williams v. Taylor, 529
U.S. 362, 413 (2000), quoted in Burch.

The applicable standard of review is to be applied to "all
claims 'adjudicated on the merits,' that is, those claims sub-
stantively reviewed and finally determined as evidenced by the
state court's issuance of a formal judgment or decree." Thomas
v. Davis, 192 F.23d 445, 455 (4th Cir. 1999). With these princi-
ples firmly in mind, this Court now directs its attention to
Petitioner's claims.

## 2. **Trial Counsel rendered ineffective assistance**.

Turning to the issue of trial counsels' unfulfilled promise
to present exculpatory evidence, at least three circuit courts

17

have acknowledged that such a failure essentially would be <u>per-se</u> ineffective under most circumstances. <u>See</u> <u>McAleese v. Mazurkiewicz</u>, 1 F.3d 159 (3rd Cir.)(opining that "[t]he failure of counsel to produce evidence which he promised the jury during his opening statement . . . is indeed a damaging failure sufficient of itself to support a claim of ineffectiveness of counsel," but rejecting petitioner's claim for lack of such an explicit or implicit promise), <u>cert. denied</u>, 510 U.S. 1028 (1993); <u>Harris v. Reed</u>, 894 F.2d 871, 877-79 (7th Cir. 1990) (holding that failure to call unbiased witnesses "after preparing the jury for the evidence through the opening" constituted ineffective assistance when no tactical consideration could have motivated decision); <u>and</u> <u>Anderson v. Butler</u>, 858 F.2d 16, 19 (1st Cir. 1988)(finding counsel's failure to present promised mitigating testimony from psychiatrist and psychologist in order to establish either manslaughter or second-degree killing -- <u>per-se</u> deficient and prejudicial).

Courts within the Fourth Circuit have rejected a <u>per-se</u> rule governing an attorney's failure to present evidence as promised in an opening statement. <u>Goins v. Angelone</u>, 52 F. Supp. 2d 638, 660 (E.D. Va. 1999) (declining to find ineffectiveness where trial counsel's decision not to present the promised evidence "had a sound trial strategy [sic] basis and did not preclude [presentation of an alternative defense]"), <u>citing</u> <u>Turner v. Williams</u>, 35 F.3d 872 (4th Cir. 1994), <u>overruled on other grounds</u>,

O'Dell v. Netherland, 95 F.3d 1214 (1996).  Rather, the Turner

Court applied the two-pronged test from Strickland v. Washington,

466 U.S. 668, 687-91 (1984), and rejected a claim of ineffective-

ness upon its finding that the decision not to present the

evidence "constituted sound trial strategy." Turner, 35 F.3d 872

at 903 (internal quotation and citation omitted).  Likewise, the

Fourth Circuit has acknowledged, in general, that "an attorney's

failure to present available exculpatory evidence is ordinarily

deficient, 'unless some cogent tactical or other consideration

justified it,'" Griffin v. Warden, Maryland Correctional

Adjustment Center, 970 F.2d 1355, 1358 (4th Cir. 1992), citing

Washington v. Murray, 952 F.2d 1472, 1476 (4th Cir. 1991).

Under Strickland and its progeny, the law is clear that a

petitioner must show that counsel's performance was constitu-

tionally deficient to the extent it fell below an objective

standard of reasonableness, and that he was prejudiced thereby.

See also Fields v. Attorney Gen'l. of Md., 956 F.2d 1290, 1297-99

(4th Cir.), cert. denied, 474 U.S. 865 (1985); Hutchins v. Garri-

son, 724 F.2d 1425, 1430-31 (4th Cir. 1983), cert. denied, 464

U.S. 1065 (1984); and Marzullo v. Maryland, 561 F.2d 540 (4th

Cir. 1977), cert. denied, 435 U.S. 1011 (1978).  With specific

regard to trial strategy, the Strickland Court stated that

"strategic choices made after thorough investigation of law and

facts relevant to plausible options are virtually unchallengable

. . . ." 466 U.S. at 690 (emphasis added).

To demonstrate prejudice, the petitioner must show a proba-
bility that the alleged errors worked to his "actual and substan-
tial disadvantage, infecting his trial with error of constitu-
tional dimensions." Murray v. Carrier, 477 U.S. 478, 494 (1986),
citing United States v. Frady, 456 U.S. 152, 170 (1982). Under
these circumstances, then, the petitioner "bears the burden of
proving Strickland prejudice." Fields, 956 F.2d at 1297, citing
Hutchins, 724 F.2d at 1430-31.

Concerning the claim that counsel were ineffective for fail-
ing to fulfill their promise[2] of presenting exculpatory evidence,
the record reflects that during opening statements, one of
Petitioner's attorneys told the jury, inter alia, that counsel
had a "confession" from a person who admitted committing the
Gunnarsson murder, and they had witnesses who had seen people
other than Petitioner leaving the scenes of those two crimes. At
the outset, the Court notes that Respondent misses the mark with
his argument that the Court cannot consider the content of the
statements by Brandon and Heather Shelton, Robbie Smith, and
Shannon Tedders because those statements were not presented to

---

[2] In an affidavit, one of Petitioner's former attorneys denies that the
defense made any promises to the jury. Admittedly, the subject statements do
not constitute an explicit promise to produce any witnesses or their evidence
at trial. Nevertheless, it cannot reasonably be argued, nor does Respondent
even attempt to argue, that the statements were not an implied promise or, at
the very least, that they did not intentionally create a reasonable expecta-
tion in the jury that the witnesses and evidence would be presented to them.

the MAR Court. Indeed, this Court need not consider the content of the statements in order to determine whether defense counsel were ineffective in failing to fulfill their promise to present exculpatory evidence.

In fact, even if the Court assumes that the subject witnesses and their testimony would not have exculpated Petitioner, under those circumstances it could not have been sound trial strategy for defense counsel to have created such high, unattainable expectations in the jury by promising to present exculpating evidence. To be sure, defense counsel gained no tactical advantages by making the promise. Nor were there any procedural considerations which required counsel to forecast the evidence. Thus, counsel's whetting of the jury's appetite with the promise of a confession and eye witness testimony which counsel knew or should have known was not exculpating, at the very least, was irresponsible. By taking the approach which they used here, defense counsel actually enabled the State to strengthen its circumstantial case by giving the prosecutors the opportunity to point out defense counsel's omission of evidence which had been painted, properly or not, as creating reasonable doubt concerning Petitioner's guilt.

Furthermore, as damaging as defense counsel's unfulfilled promise was to Petitioner's case, that damage further was compounded by defense counsels' failure effectively to address their

change in strategy. To be sure, though they had an opportunity to do so, defense counsel did not even bother to address their decision not to present their so-called eye witness evidence until _after_ the prosecution noted their failure to make good on their opening statement. To make matters worse, defense counsel _never_ addressed their decision not to present the promised confession to the jury. Thus, even if the Court were to accept that defense counsel adequately explained away the omission of the eye witness testimony, their utter failure to explain the omission of the confession -- clearly the more potentially compelling evidence -- was all the more glaring under these circumstances. Ultimately, therefore, even without considering the actual content of the Smith, Shelton and Tedders statements, the Court finds, in light of the facts of this particular case, that the defense's handling of these matters simply cannot be regarded as sound strategy which was grounded in a thorough investigation of the facts and applicable law.

Nor is the Court persuaded by Respondent's arguments that Petitioner's claim must be rejected because he has failed to establish that the subject witnesses would have testified consistently with their statements, and that their testimony likely would not have been admissible due to certain evidentiary rules. First, even assuming that the witnesses would not have testified as he believes and, in any event, that all of their testimony

would have been inadmissible, defense counsel were in the position to have known of those issues <u>prior</u> to their having promised the evidence to the jury. Once again, therefore, defense counsel's failure adequately either to assess the admissibility of the testimony or to calculate the risk of promising evidence they should have known they could not have presented cannot constitute sound trial strategy.

Second, it is not altogether clear that the defense would have been precluded from presenting <u>all</u> of the information which was alluded to in their opening statements. For instance, this Court is not aware of any rules which would have prevented the defense from presenting their so-called "eye witness" testimony. The proponents of that testimony were disinterested, third parties who had no personal stake in the outcome of the case. As such, it is conceivable that their testimony, which included Terry Osborne's representations that authorities expressed their intent to "put" the Miller murder on Petitioner, could have been quite helpful to the defense.[3] Thus, this Court simply cannot conclude that counsels' decision not to call the subject

---

[3] In addition, the Court has considered Petitioner's arguments that under relevant North Carolina law these witnesses' testimony would not have been excluded because the same was relevant to the extent that it both pointed to the guilt of another and exonerated Petitioner; and that the testimony was not excludable hearsay because it constituted statements against the penal interest of a person who could not have been compelled to testify against himself. While such arguments may, in fact, be quite plausible, this Court ultimately takes no position on them. Rather, because Petitioner did not include the subject statements in his submission to the MAR Court, this Court does not rely on their content in reaching its decision.

witnesses after promising to present exculpatory evidence was sound, tactical strategy.

The Court also rejects Respondent's argument that counsel may have chosen not to proffer the subject evidence in recognition of its weakness after comparing that evidence with the State's strong, circumstantial case. In the first place, the State did not make any eleventh-hour presentations of witnesses or evidence of which the defense was not already aware. As such, defense counsel should have anticipated the State's case and been able to compare the probable strength of the promised evidence with the State's case long before they ever addressed the jury.

Further, trial counsel's belated affidavit now explains that they did not call Brandon Shelton as a witness because they believed Shelton would have denied his involvement, and counsel's "recollection is that [Shelton] later withdrew his confession." If that, in fact, is true and accurate, then counsel had no business telling the jury that they "had a confession." Defense counsel's position also is not tenable in light of his assertion that the defense "did inquire about the confession in cross-examination, but [he] cannot recall the witness' name." Either counsel believed that they had valid evidence of a confession which they promised but failed to produce, or they promised evidence which they knew did not exist and which they had no intention of producing.

No matter the reason for the change in tactics it simply was unsound strategy for counsel to have given the State's case a boost by failing effectively to explain their omissions at their earliest opportunity to do so. Once again, the defense's omission may not have been so damaging had they first addressed it with the jury, or had the State not made such fodder of it. However, by mishandling these matters, the defense essentially inflicted a fatal wound to the credibility of their own case.

In sum, because the State's case entirely was circumstantial, the Court would find it quite difficult to imagine a more illogical, unreasonable strategy than to promise a jury exculpatory evidence of this nature and then fail both to present it and to effectively explain its omission. Under these circumstances, and similar to Anderson, defense counsels' conduct left the jury to conclude that no such evidence existed or that the impartial witnesses would not have testified as counsel had expected. In either case, defense counsels' conduct was deficient and prejudicial as defined by Strickland because it damaged Petitioner's defense and bolstered the State's case all at the same time.

Ultimately, therefore, this Court concludes that the State Court's determination that counsel were not ineffective -- for making unfulfilled, if not unfulfillable, promises to present exculpatory evidence -- was based upon an unreasonable application of Strickland. To be sure, on this record, the undersigned

cannot but conclude that had trial counsel either adequately as-
sessed the evidence before trial, promised only what they were
capable of delivering, and presented at least the eye witness
evidence, the outcome of Petitioner's trial may have been dif-
ferent. As such, trial counsels' prejudicial deficiency entitles
Petitioner to relief on this claim.

### III. <u>CONCLUSION</u>

Petitioner has established that his trial counsel was defi-
cient in their handling of certain potentially exculpatory
evidence. Therefore, this Court finds that this Petition for a
Writ of <u>Habeas Corpus</u> must be <u>granted</u>; and that Respondent's
Motion for Summary Judgment must be <u>denied</u>.

### IV. <u>ORDER</u>

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1. Respondent's combined Motion to Strike or to Authorize
Respondent to Submit New Affidavits or Evidence is **GRANTED in
part** and **DENIED in part;**

2. Respondent's Motion to Lodge Trial Counsel's Affidavit
is **GRANTED;**

3. Petitioner's first and second Motions for an Extension
of Time to File a Reply are **DISMISSED as moot;**

4. Petitioner's Motion to Amend Response to Motion to Lodge
Trial Counsel's Affidavit is **DISMISSED as moot;**

5. Petitioner's Petition for a Writ of <u>Habeas Corpus</u> is

**GRANTED;**

6. Respondent's Motion for Summary Judgment is **DENIED;**

7. Petitioner's conviction is **VACATED,** and this matter is **REMANDED** to the State Court;

8. Respondent is directed either to grant Petitioner a new trial, or to release him from custody within 180 days of the date of this Order;

9. The Clerk is directed to send copies of this Order to the petitioner and to Assistant Attorney General Clarence J. Delforge;

**SO ORDERED.**

Signed: December 23, 2009

Signature Line

Title of Signing Officer
United States District Court